UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
_____

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| CHONG PARK, | ) | Case No. 09-15596 (REG) |
| | ) | |
| Debtor. | ) | |
| _____) | ) | |
| | ) | |
| MARINA DISTRICT DEVELOPMENT CO. | ) | |
| LLC T/A BORGATA, | ) | |
| | ) | Adversary Proceeding |
| Plaintiff, | ) | No. 09-01909 (REG) |
| | ) | |
| *against* | ) | |
| | ) | |
| CHONG PARK | ) | |
| | ) | |
| Defendant. | ) | |
| _____) | ) | |

DECISION AFTER TRIAL

APPEARANCES:

CRANER, SATKIN, SCHEER & SCHWARTZ, P.C.
Counsel for Plaintiff
320 Park Avenue
P.O. Box 367
Scotch Plains, NJ 07076
By:    John A. Craner, Esq. (argued)
       Brian Schwartz, Esq.

LAW OFFICES OF GREGORY MESSER, PLLC
Counsel for Defendant
26 Court Street
Suite 2400
Brooklyn, NY 11242
By:    Gregory M. Messer, Esq. (argued)

ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE:

In this adversary proceeding under the umbrella of the chapter 7 case of Debtor-Defendant Chong Park, Plaintiff-Marina District Development Co., dba the Borgata Casino (the "**Borgata**"), seeks a judgment, pursuant to sections 523(a)(2)(A) and (B) of the Bankruptcy Code, that the $110,000 that it lent the Debtor for chips during a four-day gambling trip at the Borgata is nondischargeable.

The Borgata asserts principally that the Debtor secured the $110,000 in chips after having made false representations on two "**counter checks**," more commonly referred to as "**markers**" (drawn on the Debtor's checking account, as more fully explained below), that he signed in the course of his gambling.[1]  Imprinted on each of these markers, in fine print, was a statement that the debtor then had funds "on deposit" in that checking account to cover them.  The Debtor did not then have $110,000 in that checking account (though he had access to funds in that amount elsewhere), and because of this, the Borgata seeks to deny him his discharge.

\* \* \*

After trial,[2] the Court finds that the Debtor signed markers (one for $100,000 and another for $10,000, with the understanding that each would be cashed, if necessary, only after 45 days), that had imprinted on them statements that he then had funds "on deposit" in his checking account to cover the checks, and that these statements were not true.  And the Court assumes, without deciding, that when the Debtor signed the markers, he

---

[1]     The Borgata also asserts that it was defrauded when the Debtor failed to update his earlier statement to the Borgata listing his employer as Goldman Sachs (made at the time of his application for credit at the Borgata, two years earlier) after he left Goldman Sachs's employ.

[2]     Consistent with the Court's Case Management Order and its need to manage its docket, direct testimony was taken by affidavit or declaration (or, as the Borgata described such, "certification"), and cross-examination, redirect, and any subsequent examination proceeded live.

1

subscribed to the statements that had been preprinted on them, and should be deemed to have made representations to that effect.

But the Court further finds after trial (at which, among other things, the Court gauged the credibility of the various witnesses, most significantly the Debtor) that the Debtor did not intend to defraud the Borgata when he signed the markers. The Court further finds that the representations were not material, and that they did not cause the Borgata's loss—as the Debtor had other resources to cover the counter checks, and that his inability ultimately to honor the markers was the result of his later decision to apply $140,500 of those resources to gambling at another casino instead. And the Court further finds that the Borgata did not rely (or, of course, reasonably or justifiably rely) on the statements the Debtor subscribed to when he signed the markers, relying instead on his "pay and play" history (explained below), with years of gambling, borrowing, and repaying sums many multiples of what he then had in his checking account, and having paid back his gambling markers 54 of the 56 times that he had executed them.[3]

Though the matters here ultimately present issues of fact, the facts here have remarkable similarity to those in the four other recent decisions involving markers at casinos that contained the same preprinted representations that funds to cover the markers were then "on deposit" in the debtors' checking accounts[4]—in every one of which the

---

[3]    The Court further finds that that the Borgata learned that the Debtor no longer worked at Goldman Sachs two months before it extended him the $110,000 in credit—and that even assuming, *arguendo*, that a failure to update the employer name would make his earlier truthful written statement a materially false one, the Borgata was on notice that the Debtor no longer worked for Goldman Sachs when it extended that credit, and was not defrauded in this respect. Likewise, the Borgata could not have reasonably (or justifiably) relied on the Debtor's earlier reported employment by Goldman Sachs after it was informed that the Debtor no longer was employed there.

[4]    See *Adamar of New Jersey, Inc. v. Innerbichler (In re Innerbichler)*, 2013 Bankr. LEXIS 727, 2013 WL 659078 (B.A.P. 10th Cir. Feb. 25, 2013) ("***Innerbichler***"); *Marina District Development Co. v. Ridge (In re Ridge),* 2010 Bankr. LEXIS 3015, 2010 WL 3447669 (Bankr.

2

court declined to find nondischargeability.  This Court will rule likewise.  Here, against

the backdrop of four earlier decisions determining that the debt on those markers was

dischargeable—one of which, in fact, involved the same representation, at the same

casino[5]—the facts calling for dischargeability are as strong or stronger.  Here too

judgment will be entered for the Debtor-Defendant, and his debt will remain

dischargeable.

The Court's Findings of Fact and Conclusions of Law in connection with this

determination follow.

Findings of Fact[6]

The Debtor is a compulsive gambler, who sought help for his compulsion only

after he incurred the debts at issue here.  He is (or was at the time of the trial) 40 years of

age.  Though he formerly was an investment banker, he now is unemployed.  Until his

gambling resulted in his financial ruin, he was a very good patron of the Borgata[7]—

winning and losing (though more of the latter) sums in the hundreds of thousands of

dollars—and was a sufficiently good patron, in fact, that the Borgata provided the Debtor

with a personal host,[8] possibly a room,[9] and complimentary alcohol and pills.[10]

---

[  ]  E.D. Va. Aug. 24, 2010) (Mitchell, J.) ("***Ridge-Borgata***"); *Boardwalk Regency Corp. v. Ridge (In re Ridge)*, 2010 Bankr. LEXIS 3166, 2010 WL 3632818 (Bankr. E.D. Va. Sept. 9, 2010) (Mitchell, J.) ("***Ridge-Caesars***"); *Adamar of New Jersey, Inc. v. August (In re August),* 448 B.R. 331 (Bankr. E.D. Pa. 2011) (Fox, J.) ("***August***").

[5]  *See Ridge-Borgata,* n.4 above.

[6]  For brevity, citations are limited to the most significant matters.  Other Findings of Fact appear in the legal discussion as to which they are relevant.

[7]  As reported by "Central Credit," a gambling industry reporting bureau, the Debtor also had a gambling history with at least four other casinos at the time he first applied to the Borgata for the ability to gamble on credit. *See* Martin Exh. B at page 2.  One of them, the Mohegan Sun, had granted him a $30,000 line of credit.

[8]  The host, whose name was Alan Morales ("**Morales**"), was on the Borgata's witness list (see Pretrial Order at 9), but ultimately was not called by the Borgata.  The Borgata stated in the pretrial order that "Mr. Morales was Park's host at the Borgata and will testify as to his

3

The Debtor filed a voluntary chapter 7 petition on September 16, 2009.  After

filing a claim against the Debtor for the unpaid gambling debts, the Borgata brought this

adversary proceeding to determine the dischargeability of the debt.  As part of the trial,

the Court took evidence of the Borgata's credit practices; how the Debtor availed himself

of them; and the extent to which the matters at issue here affected the Borgata's loss.

*1.  The Borgata's Practices for Extending Credit for Gambling*

The Borgata extends credit to certain patrons for the purpose of gambling there.

The Borgata does so after the patron fills out a credit application, after further

investigation with respect to the patron, and after the patron has developed a credit

history, with consideration of the patron's history in repayment of earlier obligations.

As explained by Gary Martin, Director of Credit at the Borgata ("**Martin**"), the

Borgata's initial credit application process consists of three parts.  First the Borgata

obtains a consumer credit report.  Second, the Borgata verifies the patron's bank account

information, including the existence of the account and its current and average balances.

Third, the Borgata obtains a "gaming report" from Central Credit, a company that

---

conversations with Park."  Because the Borgata never ultimately put Morales on as a witness, the
Debtor asks that the Court draw adverse inferences as to what Morales might say.  (*See* Debtor
Written Summ. at 7).  The Court declines to do so, given the uncertainty as to what Morales might
have been asked, and limits its findings of fact with respect to Morales to what the Borgata
acknowledged—that the Borgata provided a host to the Debtor—and inferences that the Court can
draw from that, that the Borgata wanted the Debtor's patronage sufficiently that it would detail an
employee to host him.

[9]    The Debtor's pretrial brief also asserted that the Borgata additionally gave him a complimentary
room.  Debtor Pretrial Br. at 4.  Though this may possibly be true, and the record certainly does
not contradict that, evidence of that is lacking.

[10]    Debtor Aff.¶ 38.  The exact nature of the pills is unclear from the record.  Though their exact
nature ultimately is not material (except insofar as they reinforce the Court's conclusion, based
principally on other indicia, that the Debtor did not intend to defraud), the Court infers that they
were non-prescription stimulants.  The Debtor testified that during the entirety of the four-day visit
at which he issued the two markers in question, he slept less than six hours total.  *Id.* ¶ 37.  The
Debtor further testified, in testimony the Court accepts as credible, that the complimentary alcohol
and pills were offered to him "despite my requests that they stop offering."  *Id.* ¶ 38.

4

provides information regarding a credit applicant's existing obligations to other casinos. Based on this investigation, the Borgata determines the amount of credit it is willing to extend to that patron.[11]

When a patron wishes to draw down his line of credit, the patron notifies the Borgata personnel at the gambling table (who are called the "pit personnel") of the amount he wishes to draw down. The pit personnel use a computer system that is linked to the Borgata's credit department to check the customer's credit.[12]

If the requested amount of credit is within the approved available credit and there are no delinquencies, the pit personnel provide the patron with a counter check (or marker) which the patron is required to sign. The marker (in its entirety) is an approximately two inch by six inch slip of paper. Imprinted in small print on the marker (in an area 5/16" high and 2-1/2" wide) is the following statement:

> I represent that I have received cash and that said amount is available on deposit in said bank or trust company in my name. It is free from claims and is subject to this check. If dishonored, interest will be added at 12% per annum.[13]

After signing next to this representation, the patron is provided with gambling chips equal to the amount of the credit that has been drawn down. The Borgata does not contact the bank to verify that the requested amount is on deposit at the time the counter check is signed.[14]

---

[11]     Martin Cert. at 1.

[12]     *Id.*

[13]     A color copy of a marker that was true to size was submitted by the parties on the day of trial but was not marked as an exhibit. For enlarged black and white copies of the two markers at issue here (which are more readable but do not accurately reflect the size of the print), see Martin Cert. Exh. D and Exh. E.

[14]     Martin Cert. at 2, 3; Trial Tr. 25-27.

At least normally, consistent with New Jersey statute,[15] counter checks in excess of $5000 are not presented immediately for payment. Rather, the patron has 45 days within which to pay the amount owed. If the counter check is timely paid, the counter check is cancelled or redeemed and surrendered to the patron.[16] If the patron does not pay within the allotted time, the Borgata deposits the counter check for collection.[17] Because of the parties' understanding that the counter check will not be drawn upon before the passage of 45 days, it is effectively a promissory note.

When a patron wishes to increase his or her line of credit at the Borgata, the patron requests a line of credit increase from the pit personnel at the gaming table. But pit personnel do not make credit decisions. Rather, they either call the credit department or ask the patron to visit the credit department. The Borgata then checks with other casinos to see what outstanding casino debts the patron may have.[18] The credit executive that is on duty at the time is responsible for making decisions on approving or denying increases to credit lines. If the request would increase the line of credit to over $50,000, the credit executive on duty must contact either Martin or his supervisor. Under the Borgata's policies, as Martin testified, it is not necessary to check bank balances before increasing a credit line.[19]

2. *The Debtor's Activities*

The Debtor first applied for a line of credit in early January 2007 to commence on January 24, 2007. For his initial credit application (which was in part filled out by the

---

[15]   N.J. Stat. Ann. § 5:12-101c.

[16]   Pretrial Order ¶ 5.

[17]   *Id.*

[18]   Trial Tr. 50.

[19]   Trial Tr. 24-26.

Debtor, in part by the Borgata's staff, and in part by no one at all), the Debtor provided information including his address, account information for a checking account he had at Citibank, and employment details.[20]  Sections of the credit application that called for total gross income, assets, and casino debts were left blank.

The application also included a "Privacy Statement" and "Customer Agreement" in small print under which the Debtor signed his name.  The "Customer Agreement" additionally stated: "I also acknowledge that I have a continuing obligation to advise the Borgata credit staff of any change(s) in the information provided by me as stated herein."

On his initial credit application, the Debtor listed that he was a Vice President at investment bank Goldman, Sachs & Co. ("**Goldman Sachs**").  The Debtor was employed at Goldman Sachs until March 25, 2007; thereafter, in 2007 and 2008, the Debtor worked for two other firms before leaving the latter of those firms to trade on his own.[21]

The Debtor was initially granted a $30,000 line of credit.  On various dates between January 24, 2007 (the Debtor's first visit to the Borgata after being approved for a line of credit) and April 1, 2009 (during the 4-day gambling trip at the Borgata, at which the Debtor later issued the counter checks that ultimately were dishonored), the Debtor drew down his line of credit and executed a counter check on each occasion.[22] On each of these dates, the Debtor repaid the counter checks—either in cash, chips, or by the counter check being drawn on his Citibank checking account.[23]

---

[20]    Pretrial Order, Exh. C ("Borgata Line of Credit Application Documents").

[21]    Park Aff. ¶ 36.

[22]    Pretrial Order at ¶ 6.

[23]    *Id.*

On January 9, 2008, at 3:13 a.m. (*sic.*),[24] approximately one year after his initial application, the Debtor requested and was approved for a credit limit increase from $30,000 to $50,000.[25]  On January 29, 2009, approximately a year after the earlier increase (and two years after his initial credit application), the Debtor requested a credit limit increase from $50,000 to $100,000, which was also approved.[26]

On March 31, 2009, the first day of his four-day gambling trip at the Borgata, the Debtor repaid an outstanding $100,000 obligation to the Borgata.[27]  As the Debtor testified (in testimony the Court likewise found credible), he was pressured during that trip to request an increase in his credit line to $300,000 from $100,000.[28]  On April 2 (the third day of the trip), the Debtor signed the $100,000 counter check, and on April 3 (the fourth day of the trip), the Debtor signed the $10,000 counter check.  The $10,000 credit was extended to him as a 10% temporary increase to his permanent line of credit on a "this time only" basis.[29]

---

[24]     The time noted is not a mistake.  That is what the evidence shows.

[25]     Martin Cert., Exh. C ("Customer Request for Credit Limit Change Form").

[26]     *Id.*  Mr. Martin testified by affidavit that this increase in credit was approved "[b]ecause his [Debtor's] available bank account balance and his position at Goldman Sachs warranted an increase in his credit to $100,000."  The Court finds this to be inexplicable, and ultimately does not credit it.  During the entire month of January 2009, when the Debtor's credit line was increased to $100,000, the balance in his bank account never exceeded $10,000. See Pretrial Order Exh. B ("Citibank Banking Statements").  And the Borgata was put on notice in January 2009 that the Debtor was no longer employed at Goldman Sachs.  It is obvious, and the Court finds, that the Borgata relied on other things in increasing the Debtor's credit limit to such a level—the Central Credit reports, and the Debtor's track record up to that time of always repaying frequently huge gambling debts.

[27]     Pretrial Order, Exh. D ("Play Record History From Borgata").

[28]     Park Aff. ¶ 38.  The Debtor ultimately did not do so, however.  His credit was increased only by $10,000 more.

[29]     *Id.* at ¶ 39.  As explained by Molly McNamee, a Credit Executive at the Borgata ("**McNamee**") (whose testimony the Court likewise found credible, in this and all other respects), it is customary to give a patron up to 10% of his approved credit when a customer has exhausted all of his available credit.  McNamee Aff. at 2.

8

When the two counter checks totaling $110,000 were not repaid within the 45 day period, the Borgata deposited the two counter checks, both on May 21, 2009.[30]  The counter checks were marked "return to maker" and returned to the Borgata on May 27, 2009 because there were insufficient funds then in the Citibank account to cover the counter checks.[31]

### 3.  The Debtor's Pay and Play History

Over the course of the approximately 27 months during which the Debtor had a line of credit with the Borgata, the Debtor signed markers in the Borgata's favor 56 times.[32]  With respect to all but the two markers at issue here, the Debtor repaid his credit line in full, either in chips, cash, or by the counter check being drawn on his checking account.[33]

By the time, in January 2009, that the Debtor's credit line was increased from $50,000 to $100,000, the Debtor had signed, and paid back, 31 markers.  By the time, on March 31, 2009 that the Debtor arrived at the Borgata for the four-day visit at which he executed the two markers at issue here, the Debtor had signed, and paid back, 38 markers.  By the time, on April 2, 2009, that the Debtor executed the first of the two

---

[30]    Pretrial Order at 3; Martin Cert. at 4.

[31]    *Id.*

[32]    The Borgata states the number as "approximately" 47 times.  *See* Pretrial Order Borgata Contentions of Fact and Law at ¶ 14 ("Park's gambling history with the Borgata shows that over a period of approximately 27 months Park drew on his credit line approximately 47 times and on 45 of those occasions repaid his credit line in full either in chips, cash or by the countercheck drawn on his checking account.").  The Court's count of the specific markers shows an even greater 56 times. See Pretrial Order Exh. E ("Marker History Report from Borgata").  The difference is not material.  Both show many dozens of earlier markers that were executed and later paid off.

[33]    The Borgata states this as a contention of fact.  *See* Pretrial Order Borgata Contentions of Fact at ¶ 15.  The Court's review of the markers history confirms the Borgata's account in this regard.

markers that ultimately were dishonored, the Debtor had signed, and paid back, 54 markers.

Over this time, the Debtor borrowed an aggregate of $1,631,000.00 ($1.631 *million*) from the Borgata to gamble. He had paid back $1,521,000.00 ($1.521 million) of that sum before he executed the first of the two markers at issue here. Those huge sums advanced by the Borgata, and later repaid, were for the purpose of gambling there.

The Court finds that well before the Debtor issued the last two of the 56 markers in favor of the Borgata, he was a very much wanted patron there, inclined to gamble very large sums, and with a track record of borrowing, and paying back, very large sums to do so—which is exactly why the Borgata detailed a "host" for him. It is also why the Borgata increased the Debtor's credit (from $30,000 to $100,000) in January,[34] and offered to increase his credit limit even higher (from $100,000 to $300,000) just before the Debtor executed the last two markers in April.

Many of the Debtor's markers were repaid, as the Borgata contends,[35] from the Debtor's winnings or "break even," as repayment was made the same day as the draw-down of the credit line. But on five of the occasions, markers were presented for deposit

---

[34]     Martin testified that the Borgata checked the balance of the Debtor's Citibank account in January 2009, prior to increasing the Debtor's credit limit from $30,000 to $100,000. But at no time during January 2009 did the Debtor's Citibank checking account balance exceed $8,668.76. *See* Pretrial Order Exh. B ("Citibank Banking Statements"). Assuming, as the Court does, that Martin was truthful in that testimony, it once again tends to show that the Borgata relied not on the Debtor's bank account balance in making credit decisions, but rather on his pay and play history.

[35]     *Id.* at ¶ 15.

on the Debtor's Citibank checking account.[36]  On each of these five occasions, the

counter checks were honored by Citibank as there were sufficient funds in the account.[37]

Although the Borgata included the evidence of the Debtor's borrowing and

repayment history in its contentions of fact to argue that "the Borgata had every reason to

believe that Park was financially solvent so as to be able to repay the $110,000 at the time

it was advanced"[38]—and that is undoubtedly true—it shows something else as well.  It

shows the true basis for the Borgata's belief that it would be repaid.  Over the course of

his two year relationship with the Borgata, the Debtor had borrowed and repaid *over

$1.5 million* before executing the two markers here.  The Court finds that the Borgata was

aware of that fact; wanted his continuing business; and took steps—such as offering him

complimentary liquor and pills, inviting him to increase his credit limit to $300,000, and

assigning him a "host"—to continue to attract him as a patron, and to get him to gamble

(and, to facilitate his gambling, to borrow) even more.  That the Borgata considered the

Debtor to be a sufficiently attractive patron to give him complimentary alcohol and pills,

and, especially, to assign him a host, materially undercuts its arguments here that it was

relying on the language on the markers when extending credit for gambling.

The Court finds that in extending the $110,000 to the Debtor (the last of the

$1.6 million that the Borgata had advanced to the Debtor, of which $1.5 million had been

paid back), the Borgata was well aware of, and relied upon, the Debtor's gambling,

borrowing, and repayment history—what the parties' briefs and other courts that have

---

[36]     *Id.*

[37]     *Id.*

[38]     *Id.*

dealt with this issue have described as a "pay and play history"[39]—not the statements that had been imprinted on the markers.[40]

### 4. Causation

In the period between executing those two markers at the Borgata and the times (45 days after the execution of each) at which they would be cashed, the Debtor then gambled elsewhere.  Significantly, the Debtor took $140,500 of his then available resources to gamble at another casino, Caesars, on April 14, 2009, approximately two weeks after the session at the Borgata casino at which he executed the counter checks that ultimately were dishonored.[41]

The failure to have funds on deposit at the time the representations in the markers were made did not cause the Borgata's loss.  The Debtor could have paid back the Borgata's $110,000 in markers if he had not chosen to take $140,500 of his available resources to Caesars instead.  It was his subsequent decision to spend his available resources elsewhere—and not his failure to have funds in that particular account 45 days before they were to be drawn upon—that ultimately caused the Borgata's loss.

---

[39]    *See Innerbichler*, 2013 Bankr. LEXIS 727 at *15-*16, 2013 WL 659078 at *5; *August*, 448 B.R. at 340; *Ridge-Caesars*, 2010 Bankr. LEXIS 3166 at *13, 2010 WL 3632818 at *5; *Ridge-Borgata*, 2010 Bankr. LEXIS 3015 at *14-*15, 2010 WL 3447669 at *5; *Mirage-Casino Hotel v. Simpson (In re Simpson),* 319 B.R. 256, 261 (Bankr. M.D. Fla. 2003) (Briskman, J.) ("*Simpson*") ("Plaintiffs could not have reasonably relied on Defendant's bank account information. Plaintiffs' reliance instead was on Defendant's Pay and Play history, which they obtained independently of any representation from the Defendant.")  Sometimes courts would flip the two terms, describing the history as a "play and pay" history.  Any differences in that regard are not material.

[40]    Additionally, Martin testified that the Borgata checked the balance of the Debtor's Citibank account in January 2009, prior to increasing the Debtor's credit limit from $50,000 to $100,000. At no time during January 2009 did the Citibank checking account balance exceed $8,669, lending further support to the idea that the Borgata relied not on the bank account balance in making credit decisions but rather on the Debtor's pay and play history. Pretrial Order Exh. B ("Citibank Banking Statements").

[41]    Park Aff. ¶¶ 19-20.

*5.  The Debtor's Employment*

The Debtor's statement in January 2007 that he was employed at Goldman Sachs was truthful when made.  But he left Goldman Sachs approximately two months later, in March 2007.  Between March 2007 and January 2009, he worked at two other firms.[42]

Notwithstanding the undertaking on the Debtor's January 2007 credit application, the Debtor failed to take steps on his own initiative to advise the Borgata of his changes in employment.  He should have done so without any inquiry by the Borgata, as he had previously acknowledged an obligation to advise the Borgata of any changes.[43]

But the Borgata learned that the Debtor was no longer at Goldman Sachs as a consequence of the Borgata's own inquiry.  The Court accepts as credible the Debtor's testimony that he "absolutely" told the Borgata that he was no longer employed by Goldman Sachs.[44]

The Debtor was called by a female Borgata credit employee on his cell phone in January 2009.  She told the Debtor that as part of the Borgata's updating its credit records (as the Borgata was required to do under New Jersey casino regulatory requirements every two years, and as the Debtor testified was the Borgata's practice every one year),[45] the Borgata needed to update the Debtor's bank account information.  She further informed the Debtor[46] that the Borgata had previously called the Debtor at Goldman

---

[42]    Park Aff. ¶ 36.

[43]    "I also acknowledge that I have a continuing obligation to advise the Casino credit staff of any change(s) in the information provided by me as stated herein." Pretrial Order Exh. C ("Borgata Line of Credit Application Documents").

[44]    Trial Tr. 99; *accord id.* 101.

[45]    Trial Tr. 100.

[46]    While what the Borgata's employee told the Debtor led up to the call is described in these factual findings principally for background (as the female employee's account of what she was told when she couldn't reach the Debtor at Goldman Sachs is cumulative of the Debtor's account of what he

Sachs to arrange for the Debtor's participation in a three-way conference with Citibank[47]

to ascertain the Debtor's Citibank bank balances;[48] that Goldman Sachs told the Borgata

that the Debtor was no longer an employee; and that she then contacted the Debtor's host

Morales,[49] who gave her the Debtor's cell phone number.

The Borgata female employee, with the Debtor on the line, then conferenced in

Citibank to get his banking information.

Later in that discussion, the Borgata employee asked to update the Debtor's other

information, including employment information, while she had him on the phone.  As

part of that, she said "we should update your general information, are you still at

Goldman Sachs?"  The Debtor responded "no, I had left in March 2007," and "that was

three employers ago."[50]  The Debtor said that he was about to leave his then-employer

Keffi to trade on his own, and told the credit employee to simply leave the employment

information section blank.[51]

The Borgata asserts that it was never told of the Debtor's having left Goldman

Sachs' employ, and disputes the Debtor's account of the call as described above.  But

based on the Debtor's demeanor and detail in his answers on cross examination when he

was probed on his relatively sparse and conclusory (but consistent) direct testimony to

---

later told her) the Court can accept what she said for the truth of the matter asserted, as a party admission.  *See* Fed. R. Evid. 801(d)(2).

[47]    The Debtor testified that Citibank's policy (similar to that of many large institutions), was not to discuss banking balances with casinos, so the Borgata needed a three-way conference call with the Debtor on the line in order to gain this information.

[48]    The initial purpose of the call was to update banking statement information, not to verify employment.  *See* Trial Tr. 101.

[49]    *See* page 3 above.  The Debtor described Morales as a salesperson for the Borgata "whose job it is to try to entice you to come in and gamble." Trial Tr. 100.

[50]    *Id.* at 101.

[51]    *Id.* at 108.

the same effect,[52] and other relevant evidence,[53] the Court believes the Debtor.  The

Court finds, accordingly, that by the end of that call, in January 2009 (two months before

the four-day visit to the Borgata at which the Debtor signed the two markers in question),

the Borgata was on notice that the Debtor was no longer employed at Goldman Sachs.

*6.  The Debtor's Scienter*

After gauging the Debtor's demeanor, and finding the Debtor's testimony

credible, the Court finds that he did not intend to deceive or defraud the Borgata when he

executed the markers, nor did he intend to make a misrepresentation, material or

otherwise, as to his bank balance, other financial condition, or other existing fact.  The

Court likewise finds that he intended to make payment on the markers, and that he did

not expect to be unable to do so.

The Court reaches these conclusions based on a number of factors.  The Debtor

knew that he had resources (a combination of cash and lines of credit) to cover the

markers.  He also believed, reasonably or otherwise, that he could win (or at least avoid

losing) in amounts that would cover the markers, partly because of his compulsion, and

partly because he had just won over $200,000 in the preceding weeks (though he had also

lost nearly that amount).

The Court's conclusions in these respects after hearing the Debtor's testimony

and gauging his demeanor are reinforced by extrinsic facts.  As noted, although the

Debtor did not have $110,000 on deposit in his checking account, he could make

---

[52]        Debtor Aff. ¶ 35.

[53]        In addition, at trial, Mr. Martin noted that the Borgata is required by state law to verify credit
information every two years, and that he believed someone at the Borgata did so for the Debtor in
January 2009.  Trial Tr. 25.  If the Borgata did what it was required to do by law, and if the
Debtor's employment at Goldman Sachs mattered, the Borgata likely, if not certainly, would have
had the type of conversation relayed by the Debtor, and would have learned that he was no longer
employed at Goldman Sachs.

payment on the markers with the availability of funds from elsewhere. The Court's conclusions in this regard are further reinforced by his payment history, in which he had satisfied earlier markers approximately 15 times, including one, also of $100,000, earlier in the four-day gambling trip in which he later executed the two additional markers that are at issue here.

### 7. Ultimate Facts

The Court makes the following findings of ultimate facts.

1. Each of the representations on the two counter checks that the Debtor signed that "said amount is available on deposit in said bank" to cover the counter checks was not true.[54]

2. Though the Debtor did not have the funds to cover the counter checks in the account on which they were drawn, the Debtor had available funds and lines of credit sufficient to cover the counter checks from elsewhere.

3. The false representations were not material. Because of the availability of the funds elsewhere, and because the Debtor would have 45 days to place those funds into the Citibank checking account, the representations as to funds then "on deposit" in the Debtor's checking account 45 days prior to the time at which the counter checks would be drawn upon did not reflect the Debtor's ability to cover his debt. Additionally, it was the Debtor's "pay and play" history that was material to the Borgata, not his bank account balance.

---

[54]    The Debtor's counsel argues, in his written summation, that the statements were not shown to be false, because the Debtor had available funds elsewhere. But strictly speaking, the statements— each of which stated "that said amount is available on deposit in said bank"—were false. The Debtor's point rather goes to the materiality of those statements, and the failure to show that the Debtor intended to defraud.

4.  The Debtor did not intend to defraud the Borgata.  Assuming, *arguendo*, that the Debtor knew that he was then making a representation that he had the funds in that particular account, the Debtor knew he had funds available to cover the two counter checks from elsewhere.

4.  The false representations did not cause the Borgata's loss.  If the Debtor had not used $140,500 of his resources to gamble at Caesars, two weeks later, and lost that money, those available resources would have been available to cover the counter checks.

5.  The Borgata did not rely on the representations printed on the counter checks, reasonably, justifiably, or otherwise.  It instead extended him credit in such very large amounts based on his gambling history with the Borgata, and information provided by Central Credit, the service that issues reports on high roller gamblers.

6.  The Borgata knew that the Debtor was no longer employed by Goldman Sachs as of the time that it extended the credit by means of the two counter checks, having been so informed in January 2009.  Thus the Borgata was not defrauded by a failure on the part of the Debtor to update his earlier, truthful, statement that he was employed at Goldman Sachs.

7.  No evidence was introduced, and the Borgata failed to show, that the Borgata relied on the Debtor's statement, made two years earlier, that he was then employed at Goldman Sachs.  Assuming, *arguendo*, that the Borgata had so relied on the fact, any such reliance would not have been reasonable or justifiable after the Borgata was on notice that the Debtor was no longer employed there.

Discussion

I.

The Underlying Law

One of the primary purposes of the bankruptcy system is to provide debtors with a "fresh start" through the discharge of their debts.[55]  But notwithstanding a debtor's discharge as a general matter, a particular debt may still not be dischargeable when a creditor makes the requisite showing of one of the enumerated grounds for an exception under section 523(a) of the Bankruptcy Code.[56]  Nevertheless, as the Second Circuit has held, to implement the "fresh start" policy of the Bankruptcy Code, exceptions to dischargeability are "narrowly construed against the creditor's objections, and confined to those plainly expressed in the Code."[57]

The Borgata relies on two of the Code's bases for potential denial of discharge. Both are grounded in section 523(a)(2) of the Code, which provides, in relevant part, that the discharge that the Debtor otherwise receives does not discharge an individual debtor from any debt:

> (2)   for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by—
>
> (A)   false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
>
> (B)   use of a statement in writing—

---

[55]     *See, e.g.*, *Williams v. U.S. Fidelity & Guaranty Co.*, 236 U.S. 549, 554-55 (1915); *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934).

[56]     The creditor-plaintiff has the burden of proving each statutorily enumerated element of fraud by a preponderance of the evidence.  *See Grogan v. Garner*, 498 U.S. 279, 286-87 (1991); *National Union Fire Insurance Co. v. Bonnanzio (In re Bonnanzio)*, 91 F.3d 296, 300 (2d Cir. 1996).

[57]     *Bethpage Federal Credit Union v. Furio (In re Furio)*, 77 F.3d 622, 624 (2d Cir. 1996).

    (i)    that is materially false;

    (ii)   respecting the debtor's or an insider's financial condition;

    (iii)  on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

    (iv)  that the debtor caused to be made or published with intent to deceive ….

The Court starts, as usual, with textual analysis, but that is of limited utility here. Textual analysis is minimally useful with respect to subsection A, as its key bases for nondischargeability are not defined under the Code,[58] and determinations as to what constitutes "false pretenses," "a false representation," and "actual fraud" rest on common law.[59]  Textual analysis is more useful with respect to subsection B, which as relevant here, requires a written statement[60] that is "materially false," with respect to the debtor's "financial condition," on which the creditor "reasonably relied," and that the debtor caused to be made "with intent to deceive."

---

[58]    *See Field v. Mans*, 516 U.S. 59, 66 (1995) ("***Field***") ("While § 523(a)(2)(A) speaks of debt for value 'obtained by ... false pretenses, a false representation, or actual fraud,' it does not define those terms or so much as mention the creditor's reliance as such, let alone the level of reliance required.")

[59]    *See Field*, 516 U.S. at 69 ("The operative terms in § 523(a)(2)(A), on the other hand, 'false pretenses, a false representation, or actual fraud,' carry the acquired meaning of terms of art.  They are common-law terms, and, as we will shortly see in the case of 'actual fraud,' which concerns us here, they imply elements that the common law has defined them to include."); *see also id.* at 79 (Justices Breyer, with Justice Scalia joining, dissenting) ("I agree with the Court's holding that 'actual fraud' under [subsection A] incorporates the common-law elements of intentional misrepresentation.").

[60]    That, of course, prohibits the Borgata from urging nondischargeability under subsection B by reason of the alleged failure of the Debtor to comply with his promise to notify the Borgata of the change in his employer.  The Court does not need to decide when or if inaction might give rise to rights under the fraud, false representation or false pretenses provisions of subsection A.  It is sufficient now for the Court to observe, and hold, that inaction plainly does not constitute "a statement in writing" under subsection B.

19

Caselaw, particularly the very thorough decision in *August*, fills the gaps in subsections A and B, and provides further assistance in considering the statutory requirements of subsection B.

As explained in *August*, to prevail on nondischargeability under the false representation provision of subsection A, the creditor-plaintiff must demonstrate that:

> (1) the debtor made the representations knowing they were false; (2) the debtor made the representations with the intent and purpose of deceiving the plaintiff; (3) the creditor justifiably relied on the debtor's false representations; and (4) the creditor suffered a loss or damage as a proximate consequence of the representation having been made.[61]

The *August* court further emphasized that:

> [A] showing of justifiable reliance and causation of loss must be made. … Justifiable reliance is a lower standard than reasonable reliance, but nonetheless requires that the creditor prove that it actually relied upon the alleged misrepresentation or false pretenses.[62]

In analyzing the requirements for prevailing on nondischargeability under the written statement provisions of subsection B, the *August* court explained the requirements in terms tracking the language of subsection B—use of a writing that was materially false; respecting the gambler-debtor's financial condition; on which the casino reasonably relied; and that the gambler-debtor caused to be made with intent to deceive.[63] By way of clarification and supplementation, however, it turned to two earlier Circuit Court of Appeals decisions that explained the meaning of "material falsity"—"an important or

---

[61]    *August*, 448 B.R. at 349.

[62]    *Id.* at 350 (citations omitted).

[63]    *See id.* at 351.

substantial untruth"—and stated that "[a] recurring guidepost used by courts has been to examine *whether the lender would have made the loan had he known of the debtor's true financial condition*."[64]

Additionally, the *August* court emphasized, relying on a holding of the Third Circuit, that subsection B(iii) "requires that the creditor *actually rely* on the debtor's statement."[65]  And "if it were reasonable to rely on a debtor's statement, but the creditor did not in fact rely upon the false statement, (B)(iii) would not be satisfied."[66]

Finally, the Court believes that since claims under subsection B are premised simply on different kinds of fraud and misrepresentation, causation requirements applicable to claims under subsection A must be shown here as well.  While the decisions are split on whether causation is an element under subsection B as well,[67] and the Second Circuit has not spoken on this issue, logic compels this Court to rule in accordance with the decisions that have held that causation must be shown.  Since claims under subsection B are in substance claims for particular kinds of misrepresentations, and have the same conceptual underpinnings, this Court believes the requirement for causation must apply

---

[64]    *See id.* (quoting *In re Bogstad*, 779 F.2d 370, 375 (7th Cir. 1985) ("**Bogstad**") and citing *Ins. Co. of North America v. Cohn (In re Cohn)*, 54 F.3d 1108, 1114 (3d Cir. 1995) ("**Cohn**") (quoting *Bogstad*)) (emphasis added).

[65]    *Id.* (*quoting Cohn,* 54 F.3d at 1115) (emphasis in original).

[66]    *Cohn*, 54 F.3d at 1115.

[67]    *Compare Siriani v. Northwestern Nat'l Ins. Co. (In re Siriani)*, 967 F.2d 302, 304 (9th Cir. 1992); *Collins v. Palm Beach Savings & Loan (In re Collins)*, 946 F.2d 815, 816 (11th Cir. 1991); *Wall Street Management & Capital Inc. v. Crites (In re Crites)*, 419 B.R. 890, 897 (Bankr. M.D. Fla. 2009); and *Woodstock Housing Corp. v. Johnson (In re Johnson)*, 242 B.R. 283, 292 (Bankr. E.D. Pa. 1999) (proximate cause of damages must be proven), *with Wolf v. Campbell (In re Campbell)*, 159 F.3d 963, 966 (6th Cir.1998); *In re McFarland*, 84 F.3d 943, 947 (7th Cir.1996); *Norris v. First Nat'l Bank (In re Norris)*, 70 F.3d 27, 29 n. 6 (5th Cir. 1995); and *Shawmut Bank v. Goodrich (In re Goodrich)*, 999 F.2d 22, 25-26 (1st Cir. 1993) (no proximate cause of damage requirement exists).

here as well—and thus that to establish nondischargeability, the creditor must show that

the false statement in the writing caused the creditor's loss.

## II.

## The Borgata's Contentions

The Borgata contends that the debt is nondischargeable under each of subsections

A and B.  The Borgata seeks relief under subsection A "due to fraud in issuing counter

checks,"[68] based on its contention that "[t]he Borgata relied on the Defendant's written

representation that he had sufficient funds in his bank account at the time he tendered the

counter check and received chips in return."[69]  The Borgata also seeks relief under

subsection B, "due to fraud in issuing a false credit application,"[70] based on apparently

separate claims based on the Debtor's failure to notify the Borgata of the change in his

employer,[71] and, once again, his signing of the counter checks, though without reference

to the language that was imprinted upon them, and premised on a contention that the

Debtor not only did not have the funds in his Citibank account, but did not have funds

available anywhere else, either.[72]

The Court considers those Borgata contentions, in light of its Findings of Fact

after the trial—all as compared to the legal requirements for establishing

nondischargeability, as discussed in Section I above—in Section III below.  But

preliminarily, the Court must note some difficulty with the stated statutory predicates

---

[68]      *See* Borgata Pretrial Br. at 9.

[69]      *Id.* at 12.

[70]      *Id.* at 14 *et seq.*

[71]      *See id.* at 16 ("Park's failure to notify the Borgata of the change in his financial status caused him
         to commit an ongoing fraud and misrepresentation each time he drew on his credit line since he
         was doing so based upon materially false information as to his credit status.").

[72]      *See id.* ("Moreover, when he signed the last counter checks totaling $110,000, Debtor knew that
         he did not have the money in his account or available to him to repay that debt.")

underlying the claims.  Analytically, to the extent nondischargeability claims may arise

from the falsity of the statements imprinted on the markers, they arise under subsection

B, not A (as they are *written* statements relating to the Debtor's financial condition, *i.e.*,

what the Debtor had in his bank account), as several decisions have held.[73]  Likewise, if

there was a failure on the Debtor's part to comply with his contractual promise to update

the name of his employer, and if this amounted to fraud and was with the necessary

scienter, this would amount to acquiring property by fraud or false pretenses (but not by

means of a written statement with respect to the debtor's financial condition) and be

subject to subsection A, rather than subsection B.[74]

    But the distinction—which principally affects, as a practical matter, requirements

as to the nature of the creditor's reliance[75]—ultimately does not matter, because the

Borgata has failed to show an entitlement to relief under either section, for the reasons

discussed below.

<u>III.</u>

<u>Did Borgata Satisfy the Requirements for Nondischargeability?</u>

    In support of its contentions, the Borgata argues that the Debtor made two false

statements or representations.  First, the Borgata argues that the Debtor made false

representations when he signed the markers on April 2 and April 3 that had the

---

[73]    *See Trump Plaza Assocs. v. Poskanzer (In re Poskanzer)*, 143 B.R. 991, 1000 (Bankr. D.N.J.
1992); *Ridge-Borgata*, 2010 Bankr. LEXIS 3015 at *10, 2010 WL 3447669 at *3; *Ridge-Caesars,*
2010 Bankr. LEXIS 3166 at *10, 2010 WL 3632818 at *4.

[74]    However, the Court agrees with the Borgata that to the extent the Borgata seeks
nondischargeability on the contention (mentioned in its pretrial brief, see n.72 above, but not
pressed at trial) that the Debtor lacked resources from anywhere to cover the markers, this would
be a claim under subsection A.

[75]    *See Field*, 516 U.S. at 61 (establishing nondischargeability under subsection A requires only the
"less demanding" showing of "justifiable" reliance, not "reasonable" reliance—where the former
is a subjective test and the latter is an objective one—as contrasted to establishing
nondischargeability under subsection B, which by its terms requires reasonable reliance).

statements imprinted on them that the Citibank account had sufficient funds at that time

to cover them.  Second, the Borgata argues that the Debtor made a false representation by

failing to inform the Borgata that he was no longer employed by Goldman Sachs after

listing Goldman Sachs as his employer on the initial credit application.

The Court considers these in turn.

### A. False Representations on the Markers

Turning first to the Borgata's arguments premised on false representations on the

markers, the Court finds statements on the markers that were false,[76] and assumes, for the

purpose of its analysis, that the Debtor knowingly subscribed to the statements and

understood that he was effectively making them.[77]  But the Court finds that the

statements were not materially false; that the Debtor did not intend to defraud the

Borgata; that the Borgata did not rely upon them, much less reasonably or justifiably so;

and that the false statements did not cause the Borgata's loss.  In each of these respects,

the Borgata failed to meet its burden of proof.

---

[76]    Plainly the Debtor did not have the $110,000 in his checking account "on deposit" when he signed the markers, and this is what the markers said.

[77]    If the two instances on this four-day gambling trip that these counter checks were signed were the only times that the Debtor signed counter checks like these, the Court is doubtful that it would be comfortable in finding that the Debtor subscribed to the statements printed on the counter checks, or, especially, did so knowingly.  The statements were in very fine print on each of the two counter checks (each of which was two inches by six inches in total size, and on each of which the statement occupied only a small portion of the counter check as a whole), and the Court accepts as credible the testimony of the Debtor, who was a compulsive gambler, that he slept less than six hours the entire weekend, and was offered complimentary alcohol and pills.  *See* Park Aff.  ¶¶ 37, 38.  But since the Debtor had previously signed similar counter checks 54 times, the Court believes it more likely than not, and finds, that he read this language at least once.  Whether the Debtor understood that he was subscribing to these statements, and effectively making them, is not the same question, and is more debatable.  But the Court believes it appropriate to assume, without deciding, that the Debtor knowingly subscribed to the statements, though the Borgata's nondischargeability claims fail for many other reasons, including failures to show intent to defraud; the materiality of the statements; reliance; and causation.

### 1. Material Falsity

First, as the Court has found as a fact above,[78] the statement that funds were then "on deposit" at Citibank, while false, was not materially false. The Court finds that to be true here even if a statement of this character might normally be material. This was true for several reasons.

### (a) Amount in Citibank Account Did Not Matter Earlier

First, the Borgata increased the Debtor's credit line, from $50,000 to $100,000, in January 2009, when the Borgata was on notice of exactly what the Debtor then had in his Citibank checking account—and that amount was never more than $8,669.[79] Increasing his line of credit to $100,000, when the amount on deposit was such a dramatically lesser amount, evidences a lack of interest in what was in the bank account at any particular time—and suggests that the amount in the account at any particular time was not material. The January episode evidences instead the Borgata's belief and confidence that, *in the future*, the Debtor would deposit into the account—or otherwise repay—whatever was necessary to cover any markers he issued thereafter. The modest amount in the Debtor's account in January when the Borgata then gave him an astronomical line of credit is strong evidence that the amount in his account at any particular time was not material.

---

[78]   *See* page 16 above. The materiality of any false information with respect to a debtor's financial condition presents an issue of fact.

[79]   *See* Pretrial Order Exh. B ("Citibank Banking Statements").

*(b) Funds Available from Other Sources*

Second, the funds to cover the counter checks were available at the time from other sources.[80] As the Seventh Circuit held in *Bogstad*, and the Third Circuit held in *Cohn*, "[a] recurring guidepost used by courts has been to examine whether the lender would have made the loan had he known of the debtor's true financial condition." If the Borgata had been told the true facts—that the funds were not then in the Debtor's Citibank account, but were still available—there is little reason to believe, especially given the Debtor's gambling, borrowing, and repayment history—that this would have changed the Borgata's willingness to lend. It might be a minor inconvenience for the Borgata to have to wait for the Debtor to transfer any necessary funds from such other sources to the Citibank account, or to cause them to be paid directly to the Borgata, but that would not affect the Borgata's ability to be repaid.

Given the totality of the evidence, the Court concludes, as in *Ridge-Borgata* and *Ridge-Caesars*, that the Borgata regarded the counter checks more as IOUs than checks on an account, as evidenced by the Borgata's repeated willingness to accept funds in satisfaction of markers from sources other than the Citibank account over the course of the relationship, and the New Jersey statute's express endorsement of alternate means to pay a casino back.[81] On only five of the 54 prior occasions did the Borgata deposit a marker signed by the Debtor for collection on the Debtor's Citibank account. Since the essence of the Borgata's complaint is that the Debtor incurred obligations without the

---

[80]    *See* Park Aff. at ¶ 18 (indicating that the Debtor had over $269,000 available to him from various sources).

[81]    *See* N.J. Stat. Ann. § 5:12-101c (the drawer of the check may redeem the check "*by exchanging cash, cash equivalents, chips,* or a check which meets the requirements of subsection g. of this section in an amount equal to the amount for which the check is drawn") (emphasis added).

ability and intent to pay them back, and his obligations, by statute, could be satisfied by

many different means, the location of the available funds was not material.

The Court is unwilling to find that if the Borgata knew the Debtor had the

available funds, but simply somewhere else, the Borgata would have retreated from its

long-standing practice of giving the Debtor credit.

### (c)  Delay Before Draw-Down

Third, though this relates closely to the second, the Court notes once more its

factual findings that neither the Borgata nor the Debtor understood that the counter

checks would be immediately drawn upon.  The counter checks would be drawn upon

only if not otherwise satisfied after 45 days.[82]  On what was obviously a very similar

evidentiary record,[83] the *Ridge-Borgata* court observed that:

> The Borgata, like other casinos, does not
> immediately present a customer's marker but
> essentially treats it as an IOU and allows the
> customer a period of time in which to redeem it by
> paying the amount owed in cash or by wire-transfer
> or check.  Under the Borgata's policy and New
> Jersey law, the debtor had forty-five days from
> January 11, 2007 to pay off the markers.  If no
> payment was received by the 45th day, the signed

---

[82]    *See* Martin Cert. at 3 ("If the customer does not repay the amount of credit extended to him within
45 days[,] then the counter check is deposited."); Pretrial Order Stipulations as to Undisputed
Facts at ¶ 5 ("Defendant [Debtor] was required to redeem by payment in cash, chips, or otherwise,
any open and outstanding counterchecks within 45 days.  If a countercheck was timely paid, the
countercheck was cancelled or redeemed and surrendered to the Defendant.  If he failed to redeem
the countercheck, it was deposited by the Borgata for collection."); Borgata Pretrial Br. at 6
("N.J.S.A. 5:12-101c requires a counter check in excess of $5,000.00 to be deposited for collection
within forty-five calendar days of the date of the *check if the patron has not repaid the debt to the
casino in the interim*.") (emphasis added).

[83]    In fact, Mr. Martin testified in both cases.  *See*, *e.g.*, 2010 Bankr. LEXIS 3015 at *6 n.2, 2010 WL
3447669 at *2 n.2 ("According to Mr. Martin, a counter check must be for more than $5,000 for a
player to receive a delay period of 45 days.").

27

counterparts of the counter checks would be
deposited by the casino.[84]

By reason of the 45 day period before which the counter checks would be drawn

upon,[85] the *Ridge-Borgata* court further observed that:

> The marker then is more akin to a promissory note
> than to an ordinary check, which both the drawer
> and the payee would ordinarily expect to be
> promptly presented.  It permits the casino to draw
> upon the bank account *if* the debt is not paid within
> the time specified.[86]

The *Ridge-Borgata* court recognized, under those circumstances, that:

> the representation that a customer had a particular
> amount on deposit on the date a marker is signed
> *would provide no assurance that the same funds
> would be available 45 days later.  Much can
> obviously happen in 45 days*, and fraud requires a
> misrepresentation as to an existing fact and not a
> future occurrence.[87]

This Court finds that observation to be equally true here.  There was no covenant

in the Debtor's credit application papers or as part of the markers to *keep* funds in the

checking account until the marker was drawn upon.  Nor was there a representation by

the Debtor of an intent to do so.  Under these circumstances, the Court cannot find the

---

[84]    2010 Bankr. LEXIS 3015 at *6, 2010 WL 3447669 at *2 (citation to N.J. Stat. Ann. § 5:12–101c. omitted).  The Court has made like findings here.

[85]    In his posttrial written summation, counsel for the Borgata argued, for the first time, that the Borgata did not *have to* wait 45 days, and that the counter checks could instead "be deposited at any time by the Borgata without Mr. Park's knowledge or consent…."  Borgata Written Summation at 3.  Though this contention comes very late, the statute may indeed properly be read that way.  But that is inconsistent with what the Borgata stipulated to in the Pretrial Order, and with what the Borgata's Mr. Martin said in his testimony, with each of which the Borgata now will have to live.  And it is undisputed that the Borgata did in fact wait 45 days.  In any event, whether or not the Borgata could legally have drawn down on the counter checks immediately, that was not, so far as the record reflects, its practice or the Debtor's understanding of what might happen, and the Court has no doubt whatever, and finds, that neither the Debtor nor the Borgata contemplated that such might happen in this case.

[86]    2010 Bankr. LEXIS 3015 at *14, 2010 WL 3447669 at *4 (emphasis in original).  The Court has made a like finding here.

[87]    *Id.* (emphasis added).

falsity of a representation as to a state of affairs 45 days before the marker would be

drawn upon to be materially false.

The *Ridge-Borgata* court regarded this representation as relevant to reliance, and

it was one of the underpinnings of the *Ridge-Borgata* finding that the Borgata had not

there shown reliance.[88]  While the *Ridge-Borgata* court did not speak of it as also going

to materiality, this Court believes it to be relevant to both.  Since having the funds on

deposit 45 days earlier would provide no assurance that they would be there at the time

when it mattered—and "what mattered" is the touchstone of materiality—the lack of a

nexus to the state of facts *at the time when it would matter* defeats materiality.

### (d)  Other Information Being Material Instead

Fourth, the Court finds a lack of materiality with respect to the funds then on

deposit when the Borgata relied on other information instead—information from credit

---

[88]    *See* 2010 Bankr. LEXIS 3015 at *14-*15, 2010 WL 3447669 at *4-*5.  The *Ridge-Borgata* court stated that

> [a]lthough signing the markers is a necessary condition to receiving gambling chips, the fact that the casino will not deposit the markers immediately and permits payment from other accounts and in other forms significantly undermines any actual reliance on the debtor's statement that he had sufficient money in his … account on that day to cover the markers.

2010 Bankr. LEXIS 3015 at *15, 2010 WL 3447669 at *5.

In finding that Caesars had not met its burden of showing that it relied on the debtor's statement that the debtor had funds available in his account on the day he signed the marker to cover the marker, the *Ridge-Caesars* court similarly stated:

> The complicating factor, not only with respect to materiality and intent to deceive, but most importantly, with respect to reasonableness of reliance, is that neither [Caesars] nor the debtor expected that the counter checks would necessarily be presented for payment.  Caesars, consistent with New Jersey law, allowed the debtor 45 days in which to redeem the counterchecks by providing payment in some other form, which might very well come from some source other than the account on which the counter checks were drawn. The counterchecks, in short, were not the expected mode of payment, but rather a back-up. That being the case, the reality is that Boardwalk was relying less (if at all) on the account balance on a particular date—which is any event is no assurance that the funds would still be there 45 days later—than on the customer's general financial condition and established record of payment.

2010 Bankr. LEXIS 3166 at *13, 2010 WL 3632818 at *5 (citation omitted).

industry sources (most significantly, Central Credit) and the Debtor's long history of

paying off his earlier gambling markers.[89]  Historically, this has been found to defeat any

kind of reliance—and, of course, justifiable and reasonable reliance—and is addressed at

length in the "Pay and Play" discussion, Section III(A)(3)(b) below.  No useful purpose

would be served by repeating it here.

  2. *Intent to Defraud*

  Then, the Court finds, as a mixed question of fact and law (but based on the

Court's Findings of Fact with respect to scienter, above), that the Debtor did not have the

requisite intent to deceive the Borgata.  To demonstrate intent to deceive, a creditor must

prove that the debtor "made the statement knowing either that it was false, or that it was

made with such reckless disregard for the truth so as to be the 'equivalent of intent to

defraud.'"[90]  At the time the Debtor signed the markers, the Debtor had sufficient funds

available to him from various sources that would enable him to repay the $110,000 to the

Borgata.  This appears, most obviously, by the fact that he subsequently drew down and

brought $140,500 of these funds to another casino, Caesars, to gamble two weeks after

his session at the Borgata.[91]  He also believed, reasonably or otherwise, that he would

continue to win, as he had earlier on the trip, and earlier during the year.

  The Debtor had previously issued 54 markers in favor of the Borgata, and had

repaid all of them, including five where the Borgata drew down upon them at the

Debtor's bank.  After gauging the Debtor's demeanor, and his borrowing and repayment

---

[89]   *See* the discussion of Pay and Play, discussed at page 31 below.

[90]   *Hudson Valley Water Resources Inc. v. Boice (In re Boice)*, 149 B.R. 40, 47 (Bankr. S.D.N.Y. 1992) (Berk, J.) (citations omitted).

[91]   Park Aff. ¶¶ 19-20.

history, the Court cannot and does not find that he executed these last two markers with intent to defraud.

### 3. Reasonable Reliance

Next, the Court finds that the Borgata did not reasonably or justifiably rely on the false statements on the markers—or, in fact, rely upon them at all. The Court so finds for two reasons—first, as explained in *Ridge-Borgata* and *Ridge-Caesars*, the 45-day delay, and second, because the Borgata relied on the Debtor's "pay and play" history, which was a very strong one.

#### a. The 45-Day Delay

The Court has previously addressed the significance of the 45-delay in drawing down on counter checks, and the discussion in *Ridge-Borgata* and *Ridge-Caesars* of the significance of that to reliance. In neither of those cases could the court find any reliance—much less justifiable or reasonable reliance—on a state of facts 45 days before the date those facts would matter. This Court cannot either.

#### b. "Pay and Play" History

But even more importantly, as noted above in the Court's Findings of Fact, over the course of the approximately 27 months during which the Debtor had a line of credit with the Borgata, the Debtor signed markers in the Borgata's favor 56 times, and paid back the first 54 of them.[92] Over this time, the Debtor borrowed an aggregate of $1,631,000.00 ($1.631 *million*) from the Borgata to gamble, and had paid back $1,521,000.00 ($1.521 million) of that sum before he executed the first of the two markers at issue here.

---

[92]      *See* note 32 above.

The Court found, accordingly, that the Borgata was well aware of the Debtor's past gambling and borrowing history; wanted his continuing business; and took steps—such as offering him complimentary liquor and pills; inviting him to increase his credit limit to $300,000, and assigning him a "host"—to continue to attract him as a patron, and to get him to gamble (and, to facilitate his gambling, to borrow) even more.

The Court likewise found that in extending the $110,000 to the Debtor (the last of the $1.6 million that the Borgata had advanced to the Debtor, of which $1.5 million had been paid back), the Borgata was well aware of, and relied upon, the Debtor's gambling, borrowing, and repayment history—a "pay and play" history.

Five previous reported decisions have dealt with this—in each of which the court denied nondischargeability claims premised on section 523(a)(2)(A) and/or (B), because factual findings that the casino had relied on a pay and play history foreclosed the casino's contentions that it relied, or "reasonably" or "justifiably" relied, on anything else.[93]  In four of them, in fact, the pay and play history was held to defeat a claim of reliance on the exact kinds of statements that were imprinted on the Borgata's markers.[94]

In *August,* for example, the Debtor had a long pay and play history with the Adamar Tropicana casino.  As here, she had repaid large sums of money to the casino

---

[93]     *See Innerbichler*, 2013 Bankr. LEXIS 727 at *15-*16, 2013 WL 659078 at *5; *August*, 448 B.R. at 340; *Ridge-Caesars*, 2010 Bankr. LEXIS 3166 at *12-*14, 2010 WL 3632818 at *4-*5; *Ridge-Borgata*, 2010 Bankr. LEXIS 3015 at *14-*16, 2010 WL 3447669 at *4-*5; *Simpson* 319 B.R. at 261 (denying relief under section 523(a)(2)(A), stating "Plaintiffs could not have reasonably relied on Defendant's bank account information. Plaintiffs' reliance instead was on Defendant's Pay and Play history, which they obtained independently of any representation from the Defendant"); *id.* (denying relief under section 523(a)(2)(B) for same reason).

[94]     *See Innerbichler*, 2013 Bankr. LEXIS 727 at *3, 2013 WL 659078 at *1; *August*, 448 B.R. at 338; *Ridge-Caesars*, 2010 Bankr. LEXIS 3166 at *4, 2010 WL 3632818 at *2; *Ridge-Borgata*, 2010 Bankr. LEXIS 3015 at *5, 2010 WL 3447669 at *2.  In the fifth of them, *Simpson*, the casino claimed that it relied on the gambler-debtor's bank balances themselves, rather than a statement on the marker that made reference to the bank balance.  There too the pay and play history was held to defeat a reliance on the bank account balances.

over the course of the relationship. The *August* court found that the casino relied more on

that history than on any representation made by the debtor at the time she signed the

markers.[95]   The Adamar Tropicana could not show that it actually, justifiably, or

reasonably relied on the debtor's statement at the time she signed the markers that funds

were actually in her bank account.[96]

Similarly, in *Ridge-Caesars*, the court held that the casino had failed to meet its

burden of showing that it relied on the debtor's statement that the debtor had funds

available in his account equal to the amount of the markers.[97]   The court there found that

the casino "relied primarily if not exclusively on the debtor's credit history with other

casinos and on his play-and-pay history at Caesars."[98]   In *Ridge-Borgata*, the court also

found that rather than relying on the debtor's statement on the marker, the casino "relied

primarily if not exclusively on [the debtor's] credit history with other casinos [as well as

a credit report it pulled when the marker was issued]."[99]

### 4.  Causation

Finally, the Court finds that the failure to have the funds to cover the last two

markers actually in the Debtor's Citibank account did not cause the Borgata's loss.  As

noted above, the Debtor had available funds elsewhere.  Unfortunately, two weeks after

he signed the counter checks in question, the Debtor elected to use $140,500 of those

funds to gamble at Caesars instead.  It was *that* decision—hardly wise, but not a fraud

---

[95]      *Id.* at 352-53.

[96]      *See id.*; *see also Innerbichler*, 2013 Bankr. LEXIS 727 at *14-*15, 2013 WL 659078 at *5
(describing the *August* holding in this regard, and ruling the same way.

[97]      2010 Bankr. LEXIS 3166 at *14, 2010 WL 3632818 at *5.

[98]      *Id.*

[99]      2010 Bankr. LEXIS 3015 at *15-*16, 2010 WL 3447669 at *5.

with respect to money that had already been borrowed—that ultimately caused the Borgata's loss.

B. *Failure to Update Employment Information*

The Court turns next to the Borgata's argument that the Debtor's failure to update his employment information with the Borgata, after listing Goldman Sachs as his employer on the initial credit application, renders the debt nondischargeable pursuant to section 523(a)(2). The Court cannot agree.

Assuming *arguendo* that the name of his employer was material and that a failure to inform the Borgata that his employment had changed would make the earlier truthful written statement a materially false one, the Borgata still fails to meet its burden under section 523(a)(2)(A) or (B) because the Borgata was informed that the Debtor was no longer at Goldman Sachs in January 2009, and did not justifiably or reasonably rely on that fact.

The Court has found that the Borgata learned that the Debtor was no longer employed at Goldman Sachs in January 2009. As the Debtor testified at trial (in testimony the Court found, notwithstanding argument to the contrary, to be credible), the Debtor was contacted by a Borgata employee in January 2009 and notified her at that time that he was no longer employed by Goldman Sachs. Thus, the Borgata was aware of the change in the Debtor's employment well before it extended the $110,000 in credit on April 2 and April 3, 2009. The Borgata was not defrauded in this respect, and similarly cannot argue that it justifiably or reasonably relied on the Debtor's employment at Goldman Sachs in extending him this credit.

34

<u>Conclusion</u>

For the reasons set forth above, judgment will be entered in favor of Defendant

Park.  Pursuant to the requirements of Fed.R.Civ.P. 58 (as made applicable to adversary

proceedings under Fed.R.Bankr.P. 7058), counsel for Defendant-Debtor Park is to settle a

separate standalone judgment in his favor consistent with this Decision.  The time to

appeal from the resulting judgment will run from the date of its entry, and not from the

date of this Decision.

Dated: New York, New York               <u>  *s/Robert E. Gerber*    </u>
      April 22, 2013                      United States Bankruptcy Judge